IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFF SKLARIN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>GOOGLE LLC,<br><br>　　　　　Defendant. | Case No.:<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Jeff Sklarin, by and through his attorneys, Stowell & Friedman, Ltd., for his Complaint against the Defendant, Google LLC, alleges as follows:

### JURISDICTION AND VENUE

1.　Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and 42 U.S.C. § 1981. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

2.　Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). The unlawful conduct alleged in this Complaint occurred in this District.

### PARTIES

3.　Google LLC is one of the largest companies in the world. Google develops and sells technology products and services. Google services generated over $257 billion in revenue in 2021. Google was originally incorporated as Google Inc., but in a 2015 corporate restructuring

converted to an LLC. Google is now a wholly-owned subsidiary of XXVI Holdings, Inc., which is incorporated in Delaware with a principal place of business in Mountain View, California. Google's publicly traded ultimate parent company, Alphabet Inc., has a market capitalization of over $2.25 trillion as of this filing, placing it fourth among the most valuable companies in the United States as well as fourth globally.

4. Google maintains a substantial corporate presence in this District. As of 2022, Google reported that it employed over 1,800 individuals in Chicago,[1] and it transacts substantial business within this District.

5. Plaintiff Jeff Sklarin ("Sklarin"), a resident and citizen of Illinois, is a 33-year-old Jewish man, who worked at Google from 2016 until his constructive discharge in 2024. Throughout his employment, Sklarin competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his conscientious devotion to his job. Nonetheless, Sklarin was subjected to discrimination, harassment, and retaliation due to his disability and religion during his tenure.

## FACTUAL ALLEGATIONS

6. Google hired Sklarin in or around 2016 as an Agency Account Strategist.

7. Sklarin was well-qualified for his position, having worked in the technology industry since 2014 at Gigya and Gainsight, two other technology firms where he consistently hit sales goals, brought in new clients, and was quickly promoted.

8. Predictably, he excelled as an Agency Account Strategist at Google and was quickly promoted first to Senior Agency Account Strategist, then to Account Executive, and finally to Senior Account Executive.

---

[1] https://blog.google/inside-google/life-at-google/office-spotlight-chicago/

9. For his first seven years at Google, Sklarin received excellent performance reviews and substantial bonuses.

10. In or around April 2023, Sklarin began reporting to a new manager, Syed Rabbi ("Rabbi"), a Muslim, non-disabled man.

11. In or around July 2023, Rabbi and Sklarin attended a team meeting on the importance of empathy in the workplace. In the meeting, Rabbi touted himself as an "advocate" and promised to "support teammates who might be having issues," or words to that effect. Rabbi encouraged individuals on his team to be open with him about any mental health issues they may be managing.

12. Sklarin has been diagnosed with Anxiety and Depression, a protected disability. Sklarin's mental health did not impact his performance, which was outstanding throughout his tenure at Google.

13. Around the same time as the empathy meeting where Rabbi encouraged him to speak openly about his mental health, his anxiety and depression worsened due to serious issues in his personal life.

14. Since Rabbi presented himself as an "advocate" for disabled individuals, Sklarin felt it would be beneficial to be honest with Rabbi about his mental health and the family circumstances that were exacerbating his anxiety and depression.

15. In or around August 9, 2023, Sklarin told Rabbi in person that his wife and grandparents were dealing with serious health concerns that were exacerbating his anxiety and depression, making it difficult to bring his best self to work.

16. Although his mental health had not impacted his performance up to this point, as evidenced by his stellar performance reviews, Sklarin wanted to be honest with Rabbi, and was spurred on by Rabbi's encouragement to speak openly about mental health.

17. Around this same time, Rabbi found out that Sklarin is Jewish.

18. It turned out that Rabbi's self-professed "allyship" had been a façade. Instead, Rabbi used the information about Sklarin's mental health and religion to discriminate against Sklarin. After Sklarin opened up to Rabbi, Rabbi began a campaign of hostility against Sklarin, including belittling him and harassing him about his work.

19. Soon after Sklarin disclosed his mental health issues, Rabbi began to openly doubt Sklarin's mental capacity for the job, relying on discriminatory stereotypes against Sklarin's disability. For example, on or around September 21, 2023, in a formal feedback document, Rabbi told Sklarin that "I am going to be very mentally tough on you," or words to that effect.

20. Rabbi made good on this threat on November 15, 2023, when he glared at Sklarin during a meeting with a client in an attempt to unsettle Sklarin. Normally a manager would attempt to save a person in Sklarin's position because of the risk of losing a valuable client, but Rabbi just continued to glare at Sklarin.

21. Sklarin promptly reached out to Rabbi and apologized and asked to debrief, yet Rabbi initially refused to speak with him.

22. When Rabbi at last held a feedback meeting with Sklarin on or around November 17, 2023, Rabbi expressly referenced Sklarin's mental health in stereotypical and discriminatory terms, stating that the job would be "very mentally tough on you," or words to

that effect. Rabbi reiterated his threat to test Sklarin's mental fortitude, stating, "it is going to be up to you to decide how you choose to respond," or words to that effect.

23. After the meeting, Sklarin proposed in writing to Rabbi ways they could have improved the client meeting. Rabbi snapped at him, speculating that a client would "hang up the call" if Sklarin took the eminently reasonable strategy he proposed.

24. Clear that Rabbi was dead set on exacerbating Sklarin's anxiety and depression and improperly treating Sklarin's disability as disqualifying for the position he had successfully been performing before Syed's campaign of religious and disability discrimination and harassment, Sklarin was forced to apply for unpaid FMLA leave.

25. On Sklarin's last day in the office before taking leave, Rabbi said to Sklarin, "When you get back we are going to have to address if you can mentally handle the stress of this role," or words to that effect.

26. Sklarin began FMLA leave on or around November 20, 2023, and began short-term disability on or around November 29, 2023.

27. On or around January 25, 2024, Sklarin met with Rabbi to discuss his return to the office. Rabbi inappropriately inquired into Sklarin's medications, asking Sklarin if he was "taking something every day," or words to that effect. Rabbi reiterated his discriminatory belief that Sklarin was mentally incapable of performing the job because of his disability, and discouraged him from returning to work because of his mental health. Rabbi said, "Do not rush back until you are mentally ready and be prepared to run through a brick wall," or words to that effect.

28. Despite Sklarin's consistently strong performance, Sklarin's first biannual review after he disclosed his religion and disability to Rabbi and took short-term disability leave was

more negative than he had ever received at Google. Rabbi issued the review without first speaking to Sklarin or evaluating Sklarin's self-assessment presentation which outlined his accomplishments in the prior year.

29. Even though Sklarin reached 93% of his revenue target (and was on pace to improve to 98% based on a detailed pipeline that Rabbi ignored), Rabbi threatened to place Sklarin on a Performance Improvement Plan ("PIP"). Sklarin's objective performance numbers did not justify placing Sklarin on a PIP, and there are non-disabled and non-Jewish Senior Account Executives with lower numbers who were not placed on PIPs.

30. Additionally, Rabbi had no interest in "improving" Sklarin's performance, giving lie to his pretextual claim that Sklarin's performance was not meeting expectations. Rather, Rabbi tried to overwhelm Sklarin with non-constructive feedback. Rabbi's feedback after learning of Sklarin's religion and disability was subjective, unhelpful, and often flatly false. For example, on one occasion Rabbi faulted Sklarin for failing to "pitch bigger" for a client to whom Sklarin was already pitching 100% year-over-year growth. Sklarin met with the client and proposed 400% year-over-year growth, which Rabbi then said hurt the team.

31. As another example, in or around April 22, 2024, Rabbi sent Sklarin an email recap of his performance that stated Sklarin lacked product knowledge of YouTube's audience targeting features, claiming that Sklarin made an incorrect suggestion to a client. Rabbi later acknowledged that Sklarin's suggestion was in fact correct but refused to redact it from the email.

32. As another example, Rabbi once complained that Sklarin did not have enough meetings on his calendar. However, in his analysis of Sklarin's calendar, Rabbi included the 5-

day period when Sklarin was on leave for jaw surgery and a 2-day period when Sklarin was on bereavement leave.

33. It became clear to Sklarin that Rabbi was overwhelming him with non-constructive feedback because he did not want Sklarin to improve his performance. He only wanted an excuse to bully and harass Sklarin and force him out of Google.

34. Sklarin met with Kelly Twohig and Rabbi in or around April 29, 2024 to discuss his objective metrics. But at the meeting, Sklarin expressed to Twohig that he did not feel supported by Rabbi in the role because of his previous comments about Sklarin's mental health. Rabbi denied making any of the statements and lashed out at Sklarin.

35. Sklarin then met separately with Twohig, who confirmed that she had observed the combative relationship between Rabbi and Sklarin. But she insisted that Rabbi would deny any statements Sklarin attributed to him. Though she claimed that she would speak with Rabbi about the situation, Twohig never followed up.

36. With no recourse from his direct chain of reporting, Sklarin sought out relief from Rabbi's discrimination by complaining to Human Resources on or about May 15, 2024. The HR Business Partner told Sklarin that this was a "he said, she said" situation, or words to that effect. The HR Business Partner would agree to help Sklarin only by having a conversation with Rabbi. Sklarin attempted to explain how this would only make the discrimination worse, but the HR Business Partner stubbornly refused to assist Sklarin without informing Rabbi. Fearing further retaliation, Sklarin asked HR not to inform Rabbi that he contacted HR.

37. Sklarin spoke to Google's Accommodations Team on June 14, 2024. Sklarin's doctor told the Accommodations Team that he required a change of manager to protect Sklarin's mental health and provided the Accommodations Team with adequate medical information and

documentation to support his request. There were employees in Sklarin's position reporting to managers other than Rabbi. There were multiple teams that the Accommodations Team could have moved Sklarin to where he could have performed the same work.

38. The Accommodations Team told Sklarin that this was a "non-standard accommodation," or words to that effect, and denied Sklarin a change in manager.

39. Sklarin spoke to Employee Relations on June 17, 2024, which shortly thereafter began an investigation. On July 30, 2024, Employee Relations had concluded the investigation and stated that they "could not substantiate any of the claims."

40. Finding no recourse from supervisors, Human Resources, the Accommodations Team, or Employee Relations, and facing an escalating campaign of discrimination, hostile work environment, and retaliation, Sklarin was left with no choice but to leave Google to preserve his career and health.

41. In or around August 16, 2024, Sklarin was constructively discharged from Google.

42. As a result of Google's unlawful conduct, Sklarin has suffered substantial harm. Sklarin has lost wages, advancement opportunities, and other benefits, and has suffered emotional distress and other pecuniary and non-pecuniary losses as a direct result of Google's conduct, as well as incurring attorneys' fees and costs.

43. Punitive damages are appropriate due to Google's intentional conduct and reckless indifference to the federally protected rights of Sklarin.

## COUNT I

## DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

44. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

45. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships.

46. As described above, Defendant unlawfully discriminated against Plaintiff in violation of 42 U.S.C. Section 1981.

47. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages.

## COUNT II

## RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII

48. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

49. On October 21, 2024, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

50. On November 13, 2025, the EEOC issued Plaintiff a notice of right-to-sue. Plaintiff has therefore exhausted his administrative remedies.

51. Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment

opportunities or otherwise adversely affect his or her status as an employee on the basis of religion.

52. By its conduct as alleged herein, Defendant unlawfully discriminated against Plaintiff in violation of Title VII.

53. Plaintiff has been harmed as a direct and proximate result of Defendant's unlawful conduct.

## COUNT III

### DISABILITY DISCRIMINATION IN VIOLATION OF ADA

54. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

55. On October 21, 2024, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

56. On November 13, 2025, the EEOC issued Plaintiff a notice of right-to-sue. Plaintiff has therefore exhausted his administrative remedies.

57. Plaintiff was a qualified individual with a disability under the ADA because he had been diagnosed with a qualified disability, which impacted one or more of his major life functions such as work, and Defendant regarded him or perceived him as having such impairment. 29 C.F.R. § 1630.2(1).

58. Plaintiff informed Google about his disabilities and requested a reasonable accommodation, but Google refused to accommodate him.

59. Google discriminated and retaliated against Plaintiff by ignoring his doctors' orders, denying him an accommodation, subjecting him to increased scrutiny, unwarranted

performance discipline, and denying him compensation and advancement opportunities, and ultimately constructively discharging his employment.

60. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages.

## COUNT IV

### RETALIATION IN VIOLATION OF 1981, TITLE VII, AND ADA

61. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

62. On October 21, 2024, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

63. On November 13, 2025, the EEOC issued Plaintiff a notice of right-to-sue. Plaintiff has therefore exhausted his administrative remedies.

64. Each of Section 1981, Title VII, and the ADA makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as filing a charge of discrimination against his employer or complaining to his employer about discrimination on the job.

65. Plaintiff engaged in protected activity by reporting religious and disability discrimination to Human Resources, Employee Resources, the Accommodations Group, and supervisors at Google.

66. Plaintiff suffered retaliation because of his protected activity, in violation of Section 1981, Title VII, and the ADA, and was harmed as a result.

## COUNT V

### DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT

67. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

68. On October 21, 2024, Plaintiff cross-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights.

69. Upon receiving his notice of right to sue from the EEOC, Plaintiff timely notified the IDHR, which then acknowledged and dismissed his charge on December 10, 2025. Plaintiff has therefore exhausted his administrative remedies.

70. By its conduct as alleged herein, Defendant unlawfully discriminated against Plaintiff in violation of the IHRA.

71. Plaintiff engaged in protected activity by reporting religious and disability discrimination to Human Resources, Employee Resources, the Accommodations Group, and supervisors at Google.

72. By its conduct as alleged herein, Defendant unlawfully retaliated against Plaintiff in violation of the IHRA.

**WHEREFORE**, Plaintiff requests the entry of judgment in his favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Illinois Human Rights Act;

b. Award Plaintiff the value of all compensation and benefits, including any deferred compensation, lost as a result of Defendants' unlawful conduct;

c.  Order Plaintiff reinstated to his appropriate position, promotion and seniority, and otherwise make Plaintiff whole;

d.  Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

e.  Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

f.  Award Plaintiff prejudgment interest;

g.  Award Plaintiff attorneys fees, costs, and disbursements; and

h.  Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: January 16, 2026

                                                                            Respectfully Submitted,

                                                                            */s/ Linda D. Friedman*
                                                                            *Attorney for the Plaintiff*

Linda D. Friedman
Adam H. Lewis
STOWELL & FRIEDMAN, LTD.
303 W. Madison, St. 2600
Chicago, Illinois 60606
Phone: 312.431.0888
Fax: 312.431.0228